## THE AMERICAN.

## THE ST. PATRICK.

### (District Court, E. D. New York. May 4, 1912.)

COLLISION (§ 96*)—STEAMSHIP AND TOW—STEAMSHIP TURNING IN CHANNEL.

The steamship American, 409 feet long, after passing up East River in the daytime on a flood tide, started to turn to port, with the help of a tug on her starboard bow, in order to enter a slip on the Brooklyn side. When she had reached a position across the river 400 feet above the bridge, with her bow about the center of the channel, which was 1,200 feet wide, leaving a space of 200 to 250 feet between her stern and the Brooklyn piers, she stopped to await the removal of some barges from the slip. A tug with several tows passed up between her and the piers, but, when another tug with a single tow on a hawser attempted to follow, the hawser was cut by the steamship's propeller, and the tow came into collision with her. *Held*, under the evidence, that the tug took the proper course to pass, and the collision was due solely to the fault of the American in allowing herself to be drifted by the joint effects of the tug, the tide, and her own engines toward the Brooklyn side, thus narrowing the space between her and the piers, although the tug and tow were in plain view.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 203–205; Dec. Dig. § 96.*

Collision with or between towing vessels and vessels in tow. See note to The John Englis, 100 C. C. A. 581.]

In Admiralty. Suit by James F. Dwyer and others, owners of the barge Ryder, against the steamship American and the steamtug St. Patrick for collision. Decree against the American.

Foley & Martin, of New York City, for libelants.

Burlingham, Montgomery & Beecher, of New York City, for steamship American.

James J. Macklin, of New York City, for steamtug St. Patrick.

CHATFIELD, District Judge. The collision out of which this action arose occurred in the afternoon of October 14, 1911, at about 12:36 p. m. The steamship American, with a cargo of sugar, came up the East River and under the Williamsburg Bridge at an ordinary rate of speed and in charge of a Sandy Hook pilot. When opposite the Brooklyn Navy Yard, the captain of the steamtug Atwood took over the vessel from the pilot. Her engines were then slowed up in order that she might be put into a berth alongside the bulkhead between South Fifth street and South Third street, on the Brooklyn side, where she was to deliver her cargo to the sugar refinery located at that point. The steamer's engines came to a complete stop just north of the Williamsburg Bridge, and just to starboard of the center of the channel. The testimony shows that she expected to swing to port under control of the tug Atwood, and with such help as could be given by her own engines, until she headed down the river. A strong flood tide was running, and the testimony shows that the vessel could be placed most easily alongside the docks at slack water just after flood tide, but that the turn in the river could be made and the

steamer moored against the flood tide with the help of but a single tug, if her own engines were used and she was skillfully handled. A question was raised as to the propriety and safety of attempting to place the ship at her dock during flood tide, but any difference of opinion on this subject has to do solely with the safety of the ship, and therefore does not enter into the question of collision which is presented in this case.

There is little dispute as to the positions of the boats and the conditions under which the accident occurred. The tug Staples, towing four scows abreast and thus with her tow occupying a space some 200 feet wide, was going up the river a few minutes behind the steamer American. Immediately astern of the Staples was the tug St. Patrick, with the barge Ryder in tow upon a hawser 25 fathoms in length. The American passed both of these tows between the Brooklyn Bridge and the Williamsburg Bridge, and had reached a position substantially across the tide and some 400 feet above the Williamsburg Bridge when the Staples went under the bridge, and with a port helm started to go between the Brooklyn shore and the stern of the vessel. The tug Atwood was pushing against the starboard bow of the steamer, thus moving the bow of the steamer downstream against the tide, and, as was testified by the witnesses upon the steamer, turning the steamer as it were upon a pivot. The influence of the strong flood tide upon the port side of the steamer would sweep her stern upstream at a comparatively rapid rate, after she was brought to a position across the current, even if the Atwood did no more than to hold the bow against the force of the tide. This was being utilized by those in charge of the vessel, and no steerage way through the movements of the American's engines was attempted nor desired. The American is a single-screw boat, and her engines could be used only to keep her substantially in position while she was being turned by the tug and by the tide, and the testimony is sufficiently clear that her engines did not consecutively work either ahead or astern for any great length of time. The log made by the officer upon the bridge and also in the engine room has been introduced in evidence, and shows that the entries both of time and of engine movements were written up after the general entry of the collision had been made; and the time at which the vessel stopped her engines when proceeding up the river, and before turning around, is placed by these logs at but two minutes before the collision. This is manifestly incorrect, and shows that the details of the transaction were not entered in the log until the officers, immediately after the collision, put down what they could as to the general situation. The logs throw no light upon the matter, except to show that the recollection of the officers was inaccurate as to the movements of the engine, and that the entries in the log do not at all correspond with the occurrence beyond fixing the time when the collision itself happened, and when the steamer finally docked.

The witnesses all agree that the bow of the American was headed a point or two downstream from a position straight across the river just before the collision. They also agree that the bow of the Amer-

ican was substantially in midstream. A reference to the chart showing the lesser depth of water and the existence of the Third street reef upon the New York side of the river makes clear the accuracy of the testimony which locates the steamer while turning as entirely to starboard of midchannel. The river at this point is according to the chart but 1,200 feet wide between the outer end of the South Third street pier and the shallow water on the New York shore. The American was drawing at this time 26 feet 11 inches, and is 409 feet in length. The testimony also agrees that she was in such a position that her stern was from 200 to 250 feet off the end of the pier. This would bring her bow not more than 675 feet from the Brooklyn side, or substantially in the middle of the river, or even a little to the west side of midchannel. A glance at the chart will also show that the channel turns a little to the east from a point directly under the Williamsburg Bridge, and that neither the Staples and her tow, nor the St. Patrick and her tow, could cross over to the New York shore and go around the bow of the American, when they saw the American was lying across the river some 400 feet above the bridge, nor were they called upon to do so. At that point and with a flood tide, the law compels them to proceed up the starboard side of the channel, and it was evident that the American was turning to a position up and down the river during all the time in which these tows were approaching. Until the American reached a point broadside to the current, all rules of navigation would have compelled the Staples and the St. Patrick to proceed to starboard, and not to cross her bow. After the American passed a position broadside to the tide, she would again be giving more and more room to the tugs upon the starboard side of the river; and, except to avoid actual broadside collision, the tugs could not be excused for attempting to cross over to the New York side and to go around the American in this way.

The evidence shows that the Staples passed through successfully. Considerable doubt about her ability to do so seems to have arisen in the minds of all who were watching her, but she was so close to the American that it would have been dangerous for her to have attempted to turn against the tide, and to either go back or to go around the American's bow. The movement of the American's bow downstream was of itself such as to make this maneuver impossible. The St. Patrick was far enough behind the Staples so that she might have successfully turned around against the tide and thus have avoided a collision, but it would seem to have been plainly bad seamanship for her to have attempted to cross the American's bow or to go toward the New York shore, thus taking the risk of both the sweep of the flood tide and the movement of the American's bow downstream against the tide.

Under these circumstances, the success of the Staples in passing through without injury between the stern of the American and the Brooklyn shore indicates the skill of the Staples' pilot, and illustrates the small margin of safety which existed. The St. Patrick with but one boat in tow, and needing much less space, cannot be considered negligent in following the Staples, and in blowing a one-whistle signal

to the American to indicate that she expected to pass under her stern in proceeding up the river. This signal does not seem to have been heard by those upon the American. But whether or not they noticed the whistle makes no difference, for the St. Patrick and her tow were in plain sight, their movements were such that the whistle indicated nothing more than was evident, and the conduct of those upon the American was not changed at all through any doubt that the two tugs and their tows were going up along the Brooklyn shore. In other words, if the tugs had attempted to do anything else except go up along the Brooklyn shore, signals would certainly have been necessary. But, upon the facts as they existed, the failure to pay attention to the whistle of the St. Patrick proves only that those upon the American were not taking the movements of the St. Patrick into account, but assumed that she intended to pass under their stern, that there was room enough for her to do so, and that she could keep out of the way.

The Sandy Hook pilot testifies that the American just before the collision had been moving ahead slightly, but that her engines were reversed at the actual time of collision. The other witnesses upon the American are of the impression that the American was moving ahead, and that her engines were also turning ahead at the time of collision. The pilot of the tug Atwood, who was actually in charge of the American at the time, testifies that the engines of the American were going ahead before the collision, and that the wash from her propellers was such that the St. Patrick and her tow were carried over toward Brooklyn, under the force of the flood tide, in such a way that, in order to avoid the docks, a sharp sheer to port was made by the St. Patrick, that this sheer brought her into a position where her captain cast off the hawsers to the barge to avoid accident, and that the barge, thus left helpless, was carried by the tide against the American. This explanation is plainly impossible. If the wash of the propellers and the set of the tide were carrying the boats against the docks, the casting off of the hawsers would not have allowed the barge to come in contact with the steamer; for, if the St. Patrick was as close as this to the Brooklyn docks, she could not have been in a position where her hawser would come in contact with the propeller of the steamer. The hawser was cut, however, by the propeller of the steamer, and the testimony of the witness Montgomery is very convincing when he says that he came up from the fireroom, saw the port hawser severed, and threw off the starboard hawser just as the St. Patrick was shut out from sight by the stern of the American. The barge, according to the testimony of all the witnesses, kept on a straight course under the influence of the tide, and struck the after port quarter of the steamer, at a point 20 or 25 feet from the stern. The barge is said to have struck bow on, and the blow was received by the barge just to port of amidships. Such a situation could not have resulted if the St. Patrick had been close to the Brooklyn piers, nor if she had been then working over under a port helm, and failed to clear the stern of the American through an incorrect estimate of the drift of the tide. An examination of the chart will show that,

according to the American's story, her stern was being carried by the tide and also turning under the influence of the Atwood up and out into the river; that is, further away from the course of the St.. Patrick and her tow. If the St. Patrick was following the Staples up river, it would have been impossible for the hawser or barge to have come in contact with the stern of the American unless a distinct and utterly reckless change of helm had been made on the St. Patrick's part. In other words, the St. Patrick would have had to work toward the American at the extreme western side of the space through which she had to pass, with all the attendant dangers of so doing, when these dangers could have been easily avoided by following the course which a number of disinterested witnesses indicate she did follow at the time. The set of the tide slightly toward Brooklyn would cause the American, when broadside to the current, to drift up the river, and, if anything, to move astern slowly toward the Brooklyn piers. She is said by her pilots to have been opposite Fourth street and between Fourth street and Third street when lying straight across the river. She had been moving ahead just before the accident sufficiently to keep her stern away from the docks as the Atwood pushed her bow around. This shows that the force of the Atwood and the tide was tending to carry the American toward Brooklyn after reaching a position across the tide, and appears to explain what really happened.

The testimony shows that the American did not continue turning on a pivot, but that just before the accident she waited for a tug to force certain lighters away from the end of the Fifth street pier, in order that the American might be pushed broadside into the slip, with her bow close to the Fifth street pier. For this reason, the American, turning against the tide, would have to be brought around to a position where she could go slightly ahead and put her nose into the corner of the slip before her stern could be forced over to port, and thus be brought into the berth alongside of the bulkhead, with her bow downstream. It is apparent that, if the American turned under a starboard helm to a position straight across the river, she must have done so with more or less movement across the river toward New York, and that she would have had to work astern or be pushed by the Atwood toward the Brooklyn shore before her bow could be brought anywhere near the Fifth street pier. The testimony of the captain of the Atwood is to the effect that the boat was being swung as on a pivot, the bow of the Atwood, in the middle of the river, forming the pivot or center upon which the turn was being effected. The force of the Atwood and of the flood tide would accomplish the result of turning alone, but it must be borne in mind that the pivot was continually moving, and had to move, half the width of the river toward Brooklyn, and to a considerable distance downstream. Otherwise the American would be left lying in midstream, with her bow opposite Third street, and some 800 or 900 feet from where the witnesses say she was to bring up at the end of the turn. It is apparent, therefore, that, when in a position straight across the river, the American stopped for a time thus without warning, blocking the Staples and the St. Patrick in their course to starboard, and that the American then began

to turn so as to bring her head downstream against the tide, but working, with the help of her own engines and under the control of the Atwood, obliquely across the river, so that she had a sideways motion toward Brooklyn while the turn was being made. Further, if the drift of the flood tide were overcome, and particularly if the boat were brought down the river from Third to Fifth streets, the resultant motion of the different forces, represented by the boat's engines, the tide and the Atwood, would move the American slowly and gradually astern and to port or toward the Brooklyn shore, and thus carry her a slight degree into the space or water through which the Staples and her tow had just passed. The Sandy Hook pilot has said that the engines of the steamer were moving astern at the time. Some of the other witnesses have testified that the engines were standing still, and that the boat was waiting for the other tug to remove the barges from the end of the pier. Some of the other witnesses testify that the engines were turning ahead, and that the boat, just before the accident, was proceeding ahead slowly through the water.

Even assuming this to be true, the American would still be narrowing the gap unless the Atwood was also being carried away from Brooklyn, or unless the American and the Atwood together were drifting upstream with the tide, in which case there would have been no accident at all. Under these circumstances, the St. Patrick had the right to assume that the American would not be so handled as to interfere with her passage after the St. Patrick had given a signal and was all the time in plain view between the American and the Brooklyn shore. If the American had been standing at rest or turning around out in the river, or working toward New York, there certainly was no reason why the St. Patrick should not go to the Brooklyn side, instead of going across the bows of the American on the New York side of the river. If the American had been stationary and again began to turn, the responsibility upon the American was all the greater to respect the signal of the St. Patrick and give her as much room as she required before the American changed her position in the river.

It is apparent, however, that the American considered none of these things. She was bearing in mind solely the position of the lighters at the dock, and her own movements ahead or astern, so as to assist the operations of the Atwood. She appears not to have taken into account the effect upon her movements of the Atwood's turning operations, nor to have assumed that any boat would have rights in the water which she might occupy before reaching the dock, unless that boat undertook for herself the burden of keeping out of the American's way. But no such duty rested upon these boats. The very fact that the American was waiting in midstream for them to move the lighters indicates that it was the American's duty to respect the traffic inshore, and to take into account the activities of the Atwood, as under her own control in affecting the course of other vessels. The position of the St. Patrick would make it appear that she was comparatively close to the American when the necessity of turning inshore arose, and that the force of the flood tide was such as to make it impossible for the St. Patrick to get far enough over toward the Brooklyn shore to clear

the American. The captain of the St. Patrick did all that he could to get closer to the Brooklyn shore, and previous to this he assumed that the American would not change her position so as to endanger him. Assuming that to be the fact, he had a right to rely upon being given the distance which he then had, and upon not having that decreased by a change without warning in the position of the American, which was able, according to her own witnesses, to await the shifting of the lighters out of her path, but was not able to wait the few moments required for the St. Patrick and her tow to pass by.

For this the American is responsible, and the libelant may have a decree against that vessel, while the charge of the American against the St. Patrick will be dismissed.